

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-19-00093-CV

MICHAEL MARK MARTIN, RICHARD SCOTT MARTIN, JEFFREY WEBB MARTIN, INDIVIDUALLY AND ON BEHALF OF NETWORK OPERATOR SERVICES, INC., A TEXAS CORPORATION, Appellants

V.

RON HUTCHISON, TONY CASON, TIM MARTIN, AND RONNIE MARTIN, Appellees

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 2019-601-B

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

MEMORANDUM OPINION

Michael Mark Martin, Richard Scott Martin, and Jeffery Webb Martin, the minority shareholders of Network Operator Services, Inc. (NOS), appeal the dismissal of their individual and derivative claims against Appellees Tony Cason and NOS's majority shareholders, Ron Hutchison, Tim Martin, and Ronnie Martin, pursuant to the former version of the Texas Citizen's Participation Act (TCPA).[1]  In addition to dismissing the minority shareholders' claims, the trial court awarded Appellees $10,000.00 in attorney fees and assessed $10,000.00 in sanctions against the minority shareholders.  Because we determine that Appellees failed to meet their initial burden to show that the TCPA applies, we reverse the trial court's judgment and remand this case for further proceedings.[2]

I.      **Factual and Procedural Background**

A.      **Origin of the Dispute**

NOS is a family-owned, Texas corporation.  Its bylaws describe it as a close corporation, and the record shows that it was owned by ten shareholders, was taxed as an S corporation, and had no publicly traded stock.  Before NOS was incorporated, the Martin brothers (Michael, Richard, Jeffrey, Tim, and Ronnie), their father, Richard Duane Martin (Duane), and others

---

[1]Substantial revisions to the TCPA became effective on September 1, 2019.  *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, 2019 Tex. Sess. Law Serv. 684 (to be codified at TEX. CIV. PRAC. & REM. CODE §§ 27.001, .003, .005–.007, .0075, .009–.010).  Because this lawsuit was filed before the effective date of the amendments, they do not apply.  Accordingly, unless stated otherwise, all references to Chapter 27 of the Texas Civil Practice and Remedies Code in this opinion refer to the prior version of the TCPA as enacted by Act of May 21, 2011, 82d Leg., R.S., ch 341, § 2, 2011 Tex. Gen. Laws 961, amended by Act of May 24, 2013, 83d Leg., R.S., ch. 1042, 2013 Tex. Gen. Laws 2499.

[2]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.  *See* TEX. GOV'T CODE ANN. § 73.001.  We must follow the precedent of the Twelfth Court of Appeals in deciding this case.  *See* TEX. R. APP. P. 41.3.

entered into a shareholder preformation agreement (SP Agreement) to "set forth the arrangement pertaining to the formation of the business to operate a Telephone Switch System," NOS. In accordance with their capital contributions to the endeavor, the SP Agreement gave 275 shares of NOS to Duane; 125 shares each to Tim and Ronnie; and 17 shares each to Michael, Richard, and Jeffrey and divided the remaining shares to other parties. The SP Agreement recited that Tim and Ronnie were the only officers of NOS and were authorized to conduct the company's business. Tim, Ronnie, Duane, and Tony Rothrock were to be named and would "remain as directors of [NOS] so long as they remain[ed] . . . shareholder[s]." As for Michael, Richard, and Jeff, the SP Agreement specifically instructed them to deliver their proxy votes on all shareholder actions to Duane, who would vote on their behalf.

After NOS's formation in 1988, the S corporation's bylaws were drafted to set forth the requirements for meetings, among other things. The bylaws provided for an annual meeting of shareholders, but also stated,

> Any action . . . to be taken at a meeting of the shareholders, the Board of Directors or any committee designated by the Board of Directors may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by all the shareholders or members of the Board of Directors or committee, as the case may be.

Further, it clarified that regular meetings of the board could be held with or without notice, unless notice was required by the bylaws.

The bylaws specified, "The business and affairs of the Corporation and all corporate powers shall be managed by the Board of Directors, subject to any limitation imposed by statute, the Articles of Incorporation or these By-laws as to action which requires authorization or

3

approval by the shareholders," and that NOS's officers, Tim and Ronnie, and their agents, "could perform duties in the management of [NOS]" as provided by the bylaws or board. The bylaws also gave the board "the power to enter into contracts for the employment and compensation of officers for such terms as the Board deemed advisable."

At some point, Rothrock forfeited his position on NOS's board. In the 1990s, Hutchison was named Chair of NOS's board and received a 7.75 percent stake in the company. As a result, at the time of this dispute, NOS was controlled by its board of directors, Tim, Ronnie, and Hutchison, who also owned a majority of NOS's shares (collectively the Majority Shareholders).[3] After Duane passed away, his shares in NOS were spread among Michael, Richard, and Jeffrey (collectively the Minority Shareholders), who each owned 14.95 percent of NOS's shares.

The dispute arose from transfers of NOS's interest in an asset that was completed by the Majority Shareholders allegedly without the knowledge of the Minority Shareholders. We discuss the history of that asset.

In 2002, Tim and Ronnie formed a separate company called Tim Ron Enterprises, LLC (TR-LLC), a "local telephone Company servicing commercial enterprises in Longview, Texas," under the name Network Communications. In addition to being NOS board members, the Majority Shareholders were also members of TR-LLC. TR-LLC's articles of organization reserved its management to its members and stated that "any action that may be taken at any meeting of members may be taken without a meeting, without proper notice, and without a vote"

---

[3]Tim and Ronnie each owned 15.96 percent of NOS's shares, and Hutchison owned 7.75 percent.

4

if proper consent was given. It is undisputed that the Minority Shareholders had no interest in TR-LLC.

Originally, 100 percent of TR-LLC's interest was assigned to NOS. In 2004, the Majority Shareholders assigned 30 percent of NOS's interest in TR-LLC to Tony Cason, who had no interest in NOS, in exchange for Cason's consultation services to TR-LLC. This left NOS with a 70 percent interest in TR-LLC.

Becoming effective on January 1, 2015, Tim and Ronnie signed an NOS board resolution that (1) contained the following prefatory language: "Whereas this was the intent with Tim Ron Enterprises, LLC once the money it borrowed from NOS was repaid; Whereas Tim Martin, Ronnie Martin, and Ron Hutchison have personally guaranteed all debt of NOS," and (2) transferred to themselves and Hutchison 10 percent each of NOS's ownership interest in TR-LLC (the 2015 Transfer). As a result of the 2015 Transfer, NOS was left with a 40 percent interest in TR-LLC. In their petition, the Minority Shareholders contended that they were not made aware of the 2015 Transfer at the time,[4] the transfer occurred without a board meeting, and they had not seen anything showing that NOS was compensated for the loss of its interest in TR-LLC to Tim, Ronnie, and Hutchison.

In 2018, TR-LLC was sold to a third party, Contrerra Ultra Broadband Holding, Inc. (Contrerra), for $48,000,000.00. The proceeds from the sale were used to pay bonuses to TR-LLC employees and were then divided among its interest holders, including NOS. On October 23, 2018, Hutchison wrote a letter on NOS letterhead to NOS's accountant, Penny M. Young,

---

[4]The Minority Shareholders argue that the transfer was not dated and that nothing shows that it was communicated to anyone at the time.

informing her of the sale. This letter, which was also sent to Michael, represented that NOS owned 40 percent of TR-LLC and that $3,500,000.00 was being held in escrow and would be distributed to shareholders when realized. According to the Minority Shareholders, this was the first time they became aware of the 2015 Transfer that allegedly diluted NOS's interest in TR-LLC.

When the Minority Shareholders, received "approximately $1.325 Million each," based on their ownership interest in NOS, they sued Appellees, individually and on behalf of NOS,[5] after they realized that they were each "shorted" $1,434,510.71 or more and NOS was "shorted" $9,595,389.36. In their petition, the Minority Shareholders asserted that all shares of NOS were devalued when the Majority Shareholders transferred NOS's interests in TR-LLC to themselves without notice to the Minority Shareholders or a board meeting. The Minority Shareholders also complained that, without their knowledge, and at Cason's direction, $943,500.00 of the sale proceeds was used to pay bonuses, including an alleged $118,000.00 bonus to Cason. As a result, the Minority Shareholders asserted causes of action for civil theft under the Texas Theft Liability Act, conversion, breach of fiduciary duty, fraud, and money had and received, and sought the imposition of a constructive trust as a remedy.

**B.     Appellees Invoke the TCPA**

Appellees filed a motion to dismiss the Minority Shareholders' claims under the TCPA on the ground that the lawsuit was based on, related to, or in response to their exercise of the right of free speech and the right of association. Under their free speech argument, Appellees

---

[5]*See* Act of May 26, 2003, 78th Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 451*, amended by* Act of May 23, 2007, 80th Leg., R.S., ch. 688, § 84, 2007 Tex. Gen. Laws 1289 (current version at TEX. BUS. ORG. CODE § 21.563).

argued that the Minority Shareholders' claims were based on unidentified representations, non-disclosed facts, or "[c]ommunications in regard to NOS and [TR-LLC], its business, products, and ultimate sale," and that such communications were protected by the TCPA because they concerned public matters of economic well-being and provision of telecommunications services in the marketplace. Under their right of association argument, Appellees argued that the Minority Shareholders' claims involved communications between business enterprises and individuals that joined to collectively express, promote, pursue, or defend common interests.

In addition to arguing that the TCPA applied to the Minority Shareholders' claims, Appellees also argued that the Minority Shareholders could not make a prime facie case by clear and specific evidence as required by the TCPA and prayed for attorney fees and sanctions. In particular, Cason argued that, although he was instrumental in facilitating TR-LLC's sale to Contrerra, the Minority Shareholders could not make a prime facie case against him because he had no control of NOS, owed no fiduciary duty to them, and had no role in reducing NOS's interest in TR-LLC before the Contrerra sale. The Majority Shareholders argued that the Minority Shareholders could not bring a derivative lawsuit on behalf of NOS without board approval and that NOS's transfers of interest to themselves and to Cason were proper because NOS was under their control and management.

The Minority Shareholders responded to the dismissal motions by claiming that their petition did not involve communications that were a matter of public concern and, instead, involved the theft of corporate assets. The Minority Shareholders argued that it was Appellees' conduct of transferring 30 percent of NOS's interest to the Majority Shareholders, and Cason's

7

act in allegedly paying himself a bonus from the proceeds of the Contrerra sale, not their speech, that formed the basis of their claims.

After a hearing, the trial court agreed that the TCPA applied and concluded that the Minority Shareholders did not make a prima facie case by clear and specific evidence. As a result, it granted Appellees' motions to dismiss the Minority Shareholders' claims, with prejudice; awarded Appellees $10,000.00 in attorney fees; and assessed $10,000.00 in sanctions against the Minority Shareholders.

## II.       Standard of Review and Applicable Law

The TCPA, codified in Chapter 27 of the Civil Practice and Remedies Code, protects citizens and entities from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern. *Patterson v. T.V. Channel 25 Broad. Station*, 489 S.W.3d 589, 591 (Tex. App.— Texarkana 2016, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011 (Supp.); *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding)).

> The purpose of the TCPA is to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury."

*MediaOne, L.L.C. v. Henderson*, 592 S.W.3d 933, 938 (Tex. App.—Tyler 2019, pet. denied) (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.002)). To effectuate this dual purpose, "[t]he TCPA provides a mechanism for early dismissal of a cause of action that 'is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association.'" *Id.* (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.003).

8

The TCPA "requires a three-step decisional process." *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 132 (Tex. 2019). Under the first step, "[t]he party moving for dismissal has the initial burden to establish by a preponderance of the evidence 'that the legal action is based on, relates to, or is in response to the party's exercise of' the right of free speech, the right to petition, or the right of association." *Henderson*, 592 S.W.3d at 939 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)). If the movant makes this showing, under the second step, "the burden shifts to the nonmovant to establish by 'clear and specific evidence a prima facie case for each essential element of the claim in question.'" *Id.* (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c)). Even if the nonmovant makes such a showing, under the third step, "the court shall dismiss a legal action against the moving party if the moving party establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d). "When determining whether to dismiss the legal action, the court must consider 'the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based.'" *Henderson*, 592 S.W.3d at 939 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a)).[6]

In their first point of error, the Minority Shareholders argue that the trial court erred when it decided that the TCPA applied to their claims. This is an issue of statutory construction. "In construing statutes, we ascertain and give effect to the Legislature's intent as expressed by the language of the statute." *State ex rel. Best v. Harper*, 562 S.W.3d 1, 11 (Tex. 2018).

---

[6]"If the court orders dismissal, it shall award to the moving party reasonable attorney's fees and other costs and expenses, as well as sanctions." *Creative Oil & Gas, LLC*, 591 S.W.3d at 132 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a)). "The court may also award costs and fees to the non-moving party if it finds that the motion to dismiss was frivolous or solely intended for delay." *Id.* (citing TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(b)).

9

"The text of the TCPA dictates the outcome of this case[, and w]e consider issues of statutory construction *de novo*." *Creative Oil & Gas, LLC*, 591 S.W.3d at 132. Therefore, "[w]e consider de novo the legal question of whether the movant has established by a preponderance of the evidence that the challenged legal action is covered by the TCPA." *Henderson*, 592 S.W.3d at 939 (citing *Serafine v. Blunt*, 466 S.W.3d 352, 357 (Tex. App.—Austin 2015, no pet.)). "Although we construe the TCPA liberally 'to effectuate its purpose and intent fully,' it 'does not abrogate or lessen any other defense, remedy, immunity, or privilege available under other constitutional, statutory, case or common law or rule provisions.'" *Id.* at 938–39 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.011).

"It is not the Court's task to choose between competing policies addressed by legislative drafting. We apply the mandates in the statute as written." *Creative Oil & Gas, LLC*, 591 S.W.3d at 133 (quoting *In re Tex. Dep't of Family & Protective Servs.*, 210 S.W.3d 609, 614 (Tex. 2006) (orig. proceeding) (citation omitted)). Accordingly, "[a]s with any statute, courts must apply the TCPA 'as written' and 'refrain from rewriting text that lawmakers chose.'" *Id.* (quoting *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009)). "This means enforcing 'the plain meaning of the text unless a different meaning is supplied by statutory definition, is apparent from the context, or the plain meaning would lead to an absurd or nonsensical result.'" *Id.* (quoting *Beeman v. Livingston*, 468 S.W.3d 534, 538 (Tex. 2015)). "The TCPA 'assigns detailed definitions to many of the terms it employs, and we must adhere to statutory definitions.'" *Id.* (quoting *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 894 (Tex. 2018)). "This 'text-based approach to statutory construction requires us to study the

10

language of the specific provision at issue, within the context of the statute as a whole, endeavoring to give effect to every word, clause, and sentence.'" *Id.* (quoting *Ritchie v. Rupe*, 443 S.W.3d 856, 867 (Tex. 2014)).[7]

### III.    The TCPA Does Not Apply to this Case

When analyzing whether the TCPA applies to the plaintiff's legal action, "[w]e view the pleadings and evidence in the light most favorable to the nonmovant." *Morgan v. Clements Fluids S. Tex., LTD.*, 589 S.W.3d 177, 184 (Tex. App.—Tyler 2018, no pet.); *Price v. Buschemeyer*, No. 12-17-00180-CV, 2018 WL 1569856, at *2 (Tex. App.—Tyler Mar. 29, 2018, pet. denied) (mem. op.); *see Damonte v. Hallmark Fin. Servs. Inc.*, No. 05-18-00874-CV, 2019 WL 3059884, at *5 (Tex. App.—Dallas July 12, 2019, no pet.) (mem. op.) ("[W]e cannot 'blindly accept' attempts by the movant to characterize the claims as implicating protected expression.").

#### A.    The Minority Shareholders' Claims Were Not Based On, Related To, or In Response To Appellees' Exercise of the Right of Free Speech

"As written, the TCPA applies to a wide variety of claims . . . including any claim that is 'based on, relates to, or is in response to' a party's 'exercise of the right of free speech.'" *Creative Oil & Gas, LLC*, 591 S.W.3d at 133 (quoting TEX. CIV. PRAC. & REM. CODE ANN.

---

[7]The trial court did not enter findings of fact and conclusions of law even though the Minority Shareholders timely filed their requests and timely provided notice of past-due findings. The Minority Shareholders argue that the trial court erred in failing to make these findings. However, a trial court's findings are not entitled to deference when we conduct a de novo review of pure questions of law. *R2 Restaurants, Inc. v. Mineola Cmty. Bank, SSB*, 561 S.W.3d 642, 658 n.8 (Tex. App.—Tyler 2018, pet. denied).

§§ 27.003(a), 27.005(b)).[8]   "The TCPA defines 'exercise of the right of free speech' as a communication made in connection with a matter of public concern." *Henderson*, 592 S.W.3d 939–40 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)).

"The TCPA does not discriminate between public and private communications as long as they are made in connection with a matter of public concern." *Id.* at 940 (citing *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (per curiam)). "A 'communication' is defined to include 'the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(1)).[9]   "A 'matter of public concern' includes an issue related to health or safety;

---

[8]Under the amendments, the TCPA does not apply to claims that are merely "related to" an exercise of free speech or the right of association. Instead, the nonmovant's claims must be "based on or in response to a party's exercise of free speech." *Compare* Act of May 21, 2011, 82d Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 961, 961–94, *amended by* Act of May 24, 2013, 83d Leg., R.S., ch. 1042, 2013 Tex. Gen. Laws 2499, 2499–2500 *with* Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 2, 2019 Tex. Sess. Law Serv. 684, 685 (to be codified at TEX. CIV. PRAC. & REM. CODE § 27.003(a)).

[9]Appellees claim that the Minority Shareholders sued them for actions that could not have occurred without communications. Specifically, they argue that (1) the 2015 Transfer could not have occurred without the written board resolution and the assignment of interest, which are communications; (2) the Contrerra sale would not have occurred without communications; and (3) Cason's bonus transfer could not have occurred without written or oral communications. Appellees further argue that "one or more" of the communications were related to economic or community well-being or a good, product, or service in the marketplace because TR-LLC was in the business of providing telecommunications services and, therefore, issues involving TR-LLC's ownership and sale were matters of public concern. As a result, Appellees contend that the Minority Shareholders' artful pleading cannot exempt them from dismissal under the TCPA because their claims were "related to" communications that were a matter of public concern.

The Minority Shareholders respond that their petition "does not complain about anything the defendants said," but instead "complain[s] that Defendants stole money, a lot of money." As a result, they argue that their claims are based on tortious conduct, not communication. The Minority Shareholders' petition states that the lawsuit "centers on the business activities" of Appellees, including the dilution of NOS's interest in TR-LLC as a result of the 2015 Transfer and Cason's action in awarding himself a bonus from the proceeds of the sale, all without proper board authorization or notice to them or other NOS shareholders. The theft, conversion, money had and received, and breach of fiduciary duty causes of action focus on misappropriation of funds, without reference to any communications. Yet, the fraud allegation claims Appellees "misrepresented the ownership interest of the parties." For the purposes of this analysis, we assume, without deciding, that the claims in the petition involved communications.

12

environmental, economic, or community well-being; the government; a public official or public figure; or a good, product, or service in the marketplace." *Id.* (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7)).

In this transferred appeal, Appellees urge that current Tyler precedent requires us to conclude that the Minority Shareholders' claims relate to their exercise of free speech. The Minority Shareholders argue that the communications related to NOS's interests in TR-LLC were private communications about private matters, not matters of public concern, and did not involve goods, services, or products in the marketplace because NOS was a closely held corporation. Their position is supported by the Texas Supreme Court's opinion in *Creative Oil & Gas, LLC*, which was issued after this appeal was filed. *See Creative Oil & Gas, LLC*, 591 S.W.3d at 129. Because Tyler has not yet examined this issue in light of *Creative Oil & Gas*, we must determine how the Tyler court would apply this binding precedent to this case.

### 1. Current Tyler Precedent and the Law Before *Creative Oil & Gas, LLC*

Appellees rely on cases from the Tyler Court of Appeals issued before *Creative Oil & Gas LLC*, to show that they have meet their burden under the TCPA, including *Berry v. ETX Successor Tyler*. There, the Tyler court found that the filing of a hospital lien constituted a communication because the lien was "an attempt to obtain payment for medical services" and "relate[d] to health" and because "[t]he provision of medical services by a health care professional constitutes a matter of public concern." *Berry v. ETX Successor Tyler*, No. 12-18-00095-CV, 2019 WL 968528, at *3 (Tex. App.—Tyler Feb. 28, 2019, no pet.) (mem. op.) (citing *Lippincott*, 462 S.W.3d at 510). As a result, the Tyler court found that the plaintiff's petition,

which sought a declaration that emergency room charges were unreasonable under the hospital lien statute, should be dismissed under the TCPA because they were related to the hospital's exercise of the right of free speech. *Id.*

The Tyler court reached the same conclusion in *Price v. Buschemeyer*, No. 12-17-00180-CV, 2018 WL 1569856 (Tex. App.—Tyler Mar. 29, 2018, pet. denied) (mem. op.). In that case, Buschemeyer sued Price, who allegedly negotiated with hospitals to remove Buschemeyer's name from a call rotation schedule. *Id.* at *1. The Tyler court determined that the lawsuit was based on Price's communication with the hospitals. *Id.* at *3. Because those communications "relate[d] to matters of public concern, namely matters pertaining to health, safety, and community well-being," the Tyler court found that Price met his burden to show that Buschemeyer's petition was related to Price's exercise of his right to free speech. *Id.* at *4. Appellees argue that the Tyler court's interpretation of the plain meaning of the text should apply and, as a result, we should find that the Minority Shareholders' claims were related to matters of public concern because they involved telecommunication services in the marketplace or economic well-being.[10]

The Minority Shareholders distinguish *Price* and *Berry* by pointing out that those cases involved provision of health care, which many Texas courts have found to be a matter of public concern. They also argue that the fact Appellees were involved with the telecommunications industry does not necessarily mean that Appellees' communications involved a matter of public concern. Simply put, the Minority Shareholders argue that the reasoning used in *Price* and *Berry*

---

[10]They note that TR-LLC "serves primarily commercial users in Longview, Kilgore, White Oak and Marshall, Texas."

does not apply. In support, they cite to several opinions issued before *Creative Oil & Gas, LLC*, and reason that *Creative Oil & Gas, LLC*, endorsed those cases.

For example, in *Staff Care, Inc. v. Eskridge Enterprises, LLC*, No. 05-18-00732-CV, 2019 WL 2121116, at *4–5 (Tex. App.—Dallas May 15, 2019, no pet.) (mem. op.), the Dallas Court concluded that private communications made in connection with a business dispute did not involve matters of public concern where the statements themselves made no mention of health or safety and instead addressed private economic interests. In *Dyer v. Medoc Health Services*, the Dallas Court of Appeals, in dealing with communications to misappropriate and sell confidential information, wrote, "We cannot conclude communications discussing allegedly tortious conduct are tangentially related to a matter of public concern simply because the proprietary and confidential information that was to be misappropriated belonged to a company in the healthcare industry or because the alleged tortfeasors hoped to profit from their conduct." *Dyer v. Medoc Health Servs., LLC*, 573 S.W.3d 418, 428 (Tex. App.—Dallas 2019, pet. denied). The Dallas court reached the same conclusion in *Pinghua Lei v. Natural Polymer International Corp.*, 578 S.W.3d 706, 715 (Tex. App.—Dallas 2019, no pet.), when it refused to conclude that confidential information belonging to a company that sold pet treats was a matter of public concern simply because it involved promoting pet health "or because the alleged tortfeasors hoped to profit from their conduct." *Id.*[11] In *U.S. Anesthesia Partners of Texas, P.A. v. Mahana*,

---

[11]The Minority Shareholders also cite *Sloat v. Rathbun*, 513 S.W.3d 500, 508 (Tex. App.—Austin 2015, pet. dism'd), where the Austin court rejected the Church of Scientology's argument that their harassing conduct in monitoring and filming plaintiff was related to "a matter of public concern—namely, the "squirreling" of their religious doctrine"—because it "strained credulity" to consider their conduct as having any direct relationship to the issue.

15

585 S.W.3d 625, 628 (Tex. App.—Dallas 2019, pet. denied), the Dallas court wrote, "[C]onstruing private communications about an employee's alleged positive drug test or addiction as a matter of public concern merely because the employee happens to be a nurse is a potentially absurd result that was not contemplated by the Legislature." According to the Minority Shareholders, the reasoning used by the Dallas court in deciding these cases was similar to the reasoning in *Creative Oil & Gas, LLC*.

### 2. *Creative Oil & Gas, LLC*

As in this case, *Creative Oil & Gas, LLC*, involved the statutory construction of the pre-amendment version of the TCPA. *Creative Oil Gas, LLC*, 591 S.W.3d at 129. There, Lona Hills Ranch, LLC (Ranch), the lessor of an oil and gas lease, sued the lessee, Creative Oil & Gas, LLC (Lessee), for trespass to try title. *Id.* at 130. Lessee counterclaimed for "falsely [telling] third-party purchasers of production from the lease that the lease was expired and that payments on the purchases should stop." *Id.* These communications from Ranch "allegedly caused the third-party purchasers to refuse to pay the Lessee and the Operator their share of the proceeds from this production." *Id.* at 136. Lessee's petition recited that "the Ranch's 'wrongful actions' prevented the Lessee 'from receiving the proceeds of sales of oil and gas from the Lease and from producing and selling oil and gas from the Lease and receiving its portions of the proceeds of such sales.'" *Id.* at 136.

Ranch moved to dismiss under the TCPA. *Id.* at 130. Just as Appellees argue here, Ranch argued that Lessee's claim implicated its freedom of speech because statements to third parties constituted communications, and those communications were made in connection with

matters of public concern under the definition provided by Section 27.001(7) because they involved either a good, product, or service in the marketplace or economic well-being. *Id.* at 130, 134, 137. The Texas Supreme Court determined that "Ranch's communications to third parties about an oil and gas lease . . . did not involve matters of public concern under the TCPA." *Id.* at 133. It wrote, "[N]ot every communication related somehow to one of the broad categories set out in section 27.001(7) always regards a matter of public concern." *Id.* at 137.

As for the argument that the communications related to a good, service, or marketplace, the court explained,

> Of course, nearly all contracts involve "a good, product, or service." But the statute refers to a "good, product, or service *in the marketplace*." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7)(E) (emphasis added). . . . The "in the marketplace" modifier suggests that the communication about goods or services must have some relevance to a wider audience of potential buyers or sellers in the marketplace, as opposed to communications of relevance only to the parties to a particular transaction.
> Given the "in the marketplace" modifier, the TCPA's reference to "a good, product, or service" does not swallow up every contract dispute arising from a communication about the contract. By referring to communications made in connection with goods, products, or services "in the marketplace," the definition confirms that the right of free speech involves communications connected to "a matter of *public* concern." . . . . The words "good, product, or service in the marketplace," however, do not paradoxically enlarge the concept of "matters of public concern" to include matters of purely private concern. As explained above, the "in the marketplace" modifier suggests that the communication must have some relevance to a public audience of potential buyers or sellers. . . . The phrase "matter of public concern" commonly refers to matters "of political, social, or other concern to the community," as opposed to purely private matters. *Brady v. Klentzman*, 515 S.W.3d 878, 884 (Tex. 2017) (citations omitted).

17

*Id.* at 134–35. Applying these rules, The Texas Supreme Court reasoned that the Lessee's counterclaims were not covered by the TCPA because they were "based on private business communications to third-party purchasers of a single well's production." *Id.* at 136.

The court then turned to the Ranch's argument that the communications were related to economic well-being. It began by noting that it had "previously held that private communications are sometimes covered by the TCPA." *Id.* (citing *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895 (Tex. 2017); *Lippincott v. Whisenhunt*, 462 S.W.3d 507 (Tex. 2015) (per curiam)). However, it distinguished those cases by stating that they "involved environmental, health, or safety concerns that had public relevance beyond the pecuniary interests of the private parties involved." *Id.* (citing *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898, 901 (Tex. 2017) (concluding that private statements by movants concerning plaintiff's alleged failure to gauge a storage tank related to a matter of public concern due to "serious safety and environmental risks"); *Lippincott*, 462 S.W.3d at 509–10 (concluding that alleged improper provision of medical services by a health care professional are matters of public concern)). The court rejected the Ranch's argument by ruling that "[a] private contract dispute affecting only the fortunes of the private parties involved is simply not a 'matter of public concern' under any tenable understanding of those words." *Id.* at 137.

### 3. The Impact of *Creative Oil & Gas, LLC*

The Dallas Court of Appeals was first to discuss the impact of *Creative Oil & Gas, LLC*, which was decided in December of 2019, in *Goldberg v. EMR (USA Holdings) Inc.*, 594 S.W.3d 818, 824 (Tex. App.—Dallas 2020, pet. denied.). In *Goldberg*, Kenneth Goldberg co-owned a

18

scrap metal business that he sold to EMR Holdings, but he stayed on as a manager of that business after signing a confidentiality agreement promising not to use EMR's confidential information to benefit anyone other than EMR. *Id.* at 823. When he later opened a competing scrap metal business and hired EMR's employees, EMR sued Goldberg, his new business, and the former employees for theft of trade secrets, breach of contract, breach of fiduciary duty, civil conspiracy, and tortious interference with contract. *Id.* The defendants moved for a TCPA dismissal because EMR's lawsuit was based on or related to emails defendants submitted to purchasers and suppliers that, according to defendants, were communications made in connection with scrap metal in the marketplace. *Id.* at 828.

Applying *Creative Oil & Gas, LLC*, the Dallas court rejected defendants' arguments. The court reasoned,

> Even though Defendants' business of purchasing and selling scrap metal may have many beneficial effects and involve matters of health or safety, and environmental, economic, or community well-being, the communications in this case did not involve those matters. Instead, they concerned Defendants' offers to buy or sell scrap metal. The communications did not discuss the benefits of recycling, nor did the communications seek to promote health or safety, or environmental, economic, or community well-being. Instead, they were private communications regarding private commercial transactions for the purchase and sale of a commodity, scrap metal.

*Id.* at 830. Because the "communications were private communications between private parties about purely private economic matters," *Goldberg* concluded they were not "'made in connection with a matter of public concern' under the TCPA." *Id.* at 831.

The Dallas court also applied similar reasoning to reject a defendant's argument that the TCPA was triggered when plaintiffs sued for misappropriation of trade secrets, breach of

19

contract, and other claims, because the claims "involve[d] communications about medical practices, hormone therapy medication, and selling hormone therapy drugs in the marketplace." *John Thomas, M.D., J.A.A. Enters., LLC d/b/a/ S. Plains Lindsey's Day Spa, & Melissa McRae v. BioTE Med., LLC*, No. 05-19-00163-CV, 2020 WL 948087, at *4 (Tex. App.—Dallas Feb. 26, 2020, no pet.). The court found that "[d]iscussions among alleged tortfeasors to misappropriate confidential and proprietary information are not communications made in connection with a matter of public concern." *Id.* at *3. Instead of finding that the TCPA was implicated because it generally involved the healthcare industry, the court found that the matter was a "private business dispute." *Id.*

The impact of *Creative Oil & Gas, LLC*, was also discussed by other appellate courts concluding that communications that were once thought to involve matters of public concern no longer do so. *See The Methodist Hosp. d/b/a Houston Methodist Hosp. v. Willie Harvey*, No. 14-18-00929-CV, 2020 WL 1060833, at *3 (Tex. App.—Houston [14th Dist.] Mar. 5, 2020, no pet.) (mem. op.) (finding that a defamation claim based on statements by defendant that plaintiff requested personal kickbacks from a vendor did not constitute a matter of public concern because "alleged solicitation of gifts . . . do not involve a public audience of buyers and sellers"); *Gaskamp v. WSP USA, Inc.*, 596 S.W.3d 457, 477 (Tex. App.—Houston [1st Dist.] 2020, pet. filed) (op. on en banc reconsideration) (finding that "internal communication among . . . tortfeasors" about their business venture "had no potential impact on the wider community or a public audience of buyers or sellers").

20

### 4. Tyler Would Apply *Creative Oil & Gas, LLC*, to Conclude that Freedom of Speech Was Not Implicated Under the TCPA

We conclude that Tyler would apply *Creative Oil & Gas, LLC*, in the same way other sister courts have in discussing the impact of the Texas Supreme Court's holding and reasoning. The Minority Shareholders' claims were based on the 2015 Transfer and the alleged payment of bonuses to Cason, which resulted in the realization of lesser proceeds by the Minority Shareholders and NOS from the sale of TR-LLC to Contrerra.[12] Just as the Ranch could not meet the TCPA's initial burden in *Creative Oil & Gas, LLC*, by simply arguing that the communications dealt with the oil and gas industry, Appellees cannot meet the burden by pointing out that NOS and TR-LLC are involved in the telecommunications industry.

NOS had approximately ten shareholders, and TR-LLC's only other members were Tim, Ronnie, Hutchison, and Cason. Based on *Creative Oil & Gas*, we hold that the Tyler court would find that Appellees cannot show that the 2015 Transfer and alleged bonus payment to Cason had any relevance to potential buyers or sellers because stock in a closely held corporation and membership in a limited liability company is not sold in the public marketplace. *See Creative Oil & Gas, LLC*, 591 S.W.3d at 134–35; *Gaskamp*, 596 S.W.3d at 477. Instead, we find that the 2015 Transfer and alleged bonus payments involved private communications that only had relevance to "the pecuniary interests of the private parties involved." *Id.* As a result, we conclude that the Minority Shareholders' claims were not based on, related to, or in response to Appellees' exercise of the right of free speech.

---

[12]The actual sale of TR-LLC was not a basis of the Minority Shareholders' claims.

**B. The Minority Shareholders' Claims Were Not Based On, Related To, or In Response to Appellees' Exercise of Freedom of Association**

The TCPA defines the exercise of the right of association as a communication between individuals who "join together to collectively express, promote, or defend common interests." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(2). Appellees argue that because they "communicated and joined together collectively to express, promote, pursue, or defend their common interests [either] as shareholders and directors of NOS . . . or as owners of membership interests in [TR-LLC]," the Minority Shareholders' claims are related to their exercise of the right of association.[13] In response, the Minority Shareholders argue that reading the TCPA in this manner is nonsensical since such an interpretation would simply absolve joint tortfeasors from liability anytime they associated with each other to commit tortious acts. The Minority Shareholders contend that Appellees' interpretation of the TCPA to this case would be

---

[13]In support of their position that the "common interest" requirement is met, Appellees cite to *O'Hern v. Mughrabi*, 579 S.W.3d 594, 597 (Tex. App.—Houston [14th Dist.] 2019, no pet.). There, the Houston Fourteenth Court of Appeals found that claims arising from board decisions were protected by the TCPA's right of association language. *Id.* at 603. Mughrabi, a board member of a condominium association, sued the remaining four members, who approved payment to a third party to assess problems with the condominium's exterior windows and create a pilot program to oversee window replacement. *Id.* at 597. Mughrabi alleged that the remaining board members participated in the pilot program "to their personal gain and to the detriment of the other owners." *Id.* at 603. The Houston Fourteenth Court of Appeals determined that Mughrabi's lawsuit was related to the other board members' right of association because, "the factual core of his claim [was] communications amongst the Board members in making decisions, . . . which constitute pursuit or defense of a common interest, such as providing for the management, maintenance, repair, and replacement of the condominium's common elements." *Id.* at 603; *see Roach v. Ingram*, 557 S.W.3d 203, 219 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (lawsuit against judicial defendants stemming from enforcement of truancy laws and operation of the truancy court related to judicial defendants' communications between individuals joined together to collectively express, promote, pursue, or defend common interests); *Neyland v. Thompson*, No. 03-13-00643-CV, 2015 WL 1612155, at *4 (Tex. App.—Austin Apr. 7, 2015, no pet.) (finding that lawsuit based on defamatory statements made between or among members of a homeowner's association were communications between individuals who collectively joined to promote or defend their common interests as homeowners). *O'Hern*, *Neyland*, and *Roach* involved the common interests of condominium owners, homeowners, and others who were not alleged tortfeasors and are distinguished on that fact alone. Also, as further discussed below, we find that Appellees have not shown how the 2015 Transfer or the alleged bonus payment to Cason were made in pursuit or defense of a common interest.

22

"untenable" since, after all, the TCPA's "purpose is to identify and summarily dispose of lawsuits designed to chill First Amendment rights, not to dismiss meritorious lawsuits." *Patterson*, 489 S.W.3d at 591 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 27.002).

Similar arguments have resulted in split decisions among the appellate courts, which we discuss below. However, the Legislature recently amended the TCPA to clarify the statute's intended scope. Since the enactment of these Legislative amendments, several sister courts have adopted the Minority Shareholders' position in construing the pre-amendment version of the TCPA and have concluded that joint tortfeasors cannot invoke the language of the TCPA to absolve themselves of liability because the interests of joint tortfeasors are not common interests. Because Tyler has not yet examined this issue in light of the Legislative amendments, we must determine how the Tyler court would construe the amendments. We discuss the pre-amendment cases before turning to the 2019 legislative amendments and their impact on the outcome of this case.

### 1. Pre-Amendment Cases

Prior to the TCPA's 2019 legislative amendments, several courts, including Tyler, had found that the statute's broad definition of the right of association protected conduct by alleged tortfeasors who communicated with each other to advance tortious conduct in furtherance of their own interests. *See Morgan v. Clements Fluids S. Tex., Ltd.*, 589 S.W.3d 177, 184–86 (Tex. App.—Tyler 2018, no pet.); *Grant v. Pivot Tech. Sols., Ltd.*, 556 S.W.3d 865, 881 (Tex. App.—Austin 2018, pet. denied); *Elite Auto Body LLC v. Autocraft Bodywerks, Inc.*, 520 S.W.3d 191, 205 (Tex. App.—Austin 2017, pet. dism'd). These courts reasoned that, once a defendant shows

that the complained-of conduct involves a communication, the "common interest" element of the exercise of the right of association is satisfied by the interests advanced by the tortfeasors' conduct. *See Morgan*, 589 S.W.3d at 185; *Grant*, 556 S.W.3d at 881; *Elite Auto Body*, 520 S.W.3d at 205.

For example, *Morgan* involved former employees of Clements who signed non-disclosure agreements promising not to (1) disclose proprietary information related to Clements's salt systems to third parties or (2) solicit employees from Clements for one year after any termination of employment. *Morgan*, 589 S.W.3d at 182. Clements alleged that the former employees violated their agreement when they disclosed its salt system trade secrets to their new employer, one of Clements's competitors. *Id.* In response, the employees moved to dismiss under the TCPA and argued that Clements's lawsuit infringed on their right to freely associate with their new employer. *Id.* at 184. The Tyler Court of Appeals agreed. It applied the plain meaning of the TCPA and found, "Clements' misappropriation of trade secrets claim is 'based on, relates to, or is in response to,' at least in part, Appellants' 'communications' among themselves and others within the [new employer's] enterprise through which they have allegedly shared or utilized the information to which Clements claims trade secret protection." *Id*. at 185.

Yet, other courts took the position that the TCPA would not allow such an interpretation benefitting joint tortfeasors. In *Kawcak v. Antero Resources Corp.*, the Fort Worth court rejected the argument that a conspiracy claim necessarily involved the right of association because the court could not "agree with Kawcak's position that the TCPA is so all-encompassing a protection that any party making a conspiracy claim must face the potential of these consequences."

24

*Kawcak v. Antero Res. Corp.*, 582 S.W.3d 566, 569 (Tex. App.—Fort Worth 2019, pet. denied). Instead, the Fort Worth court focused on the word "common" and said that the plain meaning of the word "implicate[d] more than the narrow selfish interests of persons who act jointly to commit a tort." *Id.* The plaintiff's lawsuit only referenced communications between two tortfeasors. *Id.* at 576. As a result, the Fort Worth court reasoned that the right of association "must be shared by the public or at least a group" and narrowed its holding because it "was not required to determine what group crosses the boundary of common." *Id.*

The Dallas court reached the same result in *Dyer* when it found that "construing the statute such that appellants would have a 'right of association' based solely on [tortfeasors'] private communications allegedly pertaining to the misappropriation of [trade secrets] is an absurd result that would not further the purpose of the TCPA to curb strategic lawsuits against public participation." *Dyer*, 573 S.W.3d at 426–27; *see John Thomas M.D.*, 2020 WL 948087, at *2–3; *Erdner v. Highland Park Emergency Ctr., LLC*, 580 S.W.3d 269 (Tex. App.—Dallas 2019, pet. denied). Instead, *Dyer* opined that under the TCPA, "the nature of the 'communication between individuals who join together' must involve public or citizen's participation." *Dyer*, 573 S.W.3d at 426 (quoting *ExxonMobil Pipeline Co. v. Coleman* (*Coleman I*), 464 S.W.3d 841, 847 (Tex. App.—Dallas 2015), *rev'd on other grounds*, (*Coleman II*), 512 S.W.3d 895, 900–01 (Tex. 2017).

The Houston Fourteenth Court of Appeals also held that the TCPA's right of association does not apply when the communications are made "in furtherance of a conspiracy to conduct unlawful or tortious acts of conversion or theft of property." *Bandin v. Free & Sovereign State*

25

*of Veracruz de Ignacio de la Llave*, 590 S.W.3d 647, 649 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). It reasoned,

> Construing the definitions of the rights to free speech and of association as encompassing all communications to further a civil conspiracy to commit tortious acts, as urged by appellants, would be to construe these rights in isolation from the legislature's twin purposes to protect constitutional rights and the right to file meritorious lawsuits.

*Id.* at 653.

### 2. The 2019 Legislative Amendment to The Exercise of the Right of Association

"In 2019, the Texas Legislature passed House Bill 2730, amending numerous TCPA provisions and providing clarification for its application." *Gaskamp*, 596 S.W.3d at 474 (citing Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 1–12, 201 Tex. Sess. Law Serv. 684 (current version at TEX. CIV. PRAC. & REM. CODE §§ 27.001–27.011)). The Senate Research Center prepared a bill analysis providing the following "insight into the reasons behind the 2019 amendments":

> Certain statutory provisions relating to expedited dismissal procedures for lawsuits involving the exercise of free speech, the right of association, and the right to petition lend themselves to unexpected applications because they are overly broad or unclear. H.B. 2730 seeks to remedy this issue by clarifying the scope and applicability of those provisions.

*Id*. (quoting Senate Research Ctr., Bill Analysis, Tex. H.B. 2730, 86th Leg., R.S. (2019)).

"Under the amended version of the statute, '[e]xercise of the right of association' is now defined as 'join[ing] together to collectively express, promote, pursue, or defend common interests relating to a governmental proceeding or a matter of public concern.'" *Bandin*, 590

26

S.W.3d at 651 n.7 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(2)). "Accordingly, the act now requires the subject communication to relate to a governmental proceeding or matter of public concern to implicate the right of association." *Id*. The phrase "matter of public concern" is now defined as any activity or statement "regarding:  (A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." *Gaskamp*, 596 S.W.3d at 475 (citing Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 1, sec. 27.001(7), 2019 Tex. Sess. Law Serv. 684, 685). As a result, "the recent amendments to the TCPA . . . support defining 'common' to mean 'of or relating to a community at large:  public.'" *Id.*

### 3. Post-Amendment Cases

The 2019 legislative changes had an impact on the interpretation of the TCPA, even in cases reviewing the pre-amendment version of the statute. An example of this impact is seen in the Houston First Court of Appeals' opinion in *Gaskamp*. There, after an employee left WSP to form his own company and hired several former WSP employees, WSP sued for misappropriation of trade secrets, breach of fiduciary duty, breach of loyalty, and unjust enrichment after the newly-formed company began offering the same services and "featured products" provided and developed by the former employees while they were working for WSP. *Id.* at 462–63, 466–67. The employees moved to dismiss the claims on the ground that WSP's suit was "based on [their] communications in the formation, promotion, and pursuit of their common interest—[the new company]—and involve[d] alleged communications among

27

[employees]" through which they misappropriated trade secrets and conspired to misappropriate the trade secrets and breach their fiduciary duties to WSP. *Id.* at 471.

The court of appeals in *Gaskamp* agreed with *Kawcak*'s statutory interpretation of the word "common" in the phrase common interest but acknowledged that *Kawcak* "left unanswered whether allegations of three or more tortfeasors acting together . . . for their own benefit fits the definition of 'common.'" *Id.* at 473 (citing *Kawcak*, 582 S.W.3d at 588). The court of appeals noted,

> The word "common" has a variety of meanings. These meanings include: (1)"of or relating to a community at large: public"; (2) "belonging to or shared by two or more individuals or things or by all members of a group"; (3) "occurring or appearing frequently: familiar"; (4) "widespread, general"; and (5) "falling below ordinary standards: second-rate."

*Id.* (citing *Common*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/ common (last visited Feb. 12, 2020) (capitalization omitted)). Although the second definition fit the employees' argument, the court "[could not] agree that this was the meaning of 'common' intended by the Legislature when it enacted the TCPA" and instead found that the first definition was "the closest to the intended meaning of the term when considered in the context of the TCPA's statutory scheme." *Id.* at 474.

Even though the 2019 legislative amendments did not apply to the case, the court of appeals used them to support its reasoning because "[w]hen the meaning of an existing law is uncertain, the Legislature's later interpretation of it is highly persuasive." *Id.* at 475 (quoting *Tex. Water Comm'n v. Brushy Creek Mun. Util. Dist.*, 917 S.W.2d 19, 21 (Tex. 1996) citing *Stanford v. Butler*, 181 S.W.2d 269, 274 (Tex. 1944)). According to the court, this was

28

especially true of the TCPA since (1) "the pre-amendment meaning of 'exercise of the right of association' [was] uncertain," as shown by the split among the Texas appellate courts, (2) there is a presumption "that the Legislature was aware of the conflicting holdings in the caselaw when it enacted the 2019 amendments," (3) "the bill analysis indicate[s] that the amendments were necessary to clarify 'overly broad or unclear' provisions in the TCPA," and (4) by its amendments, "the Legislature chose to define 'common interests' in a manner most in line with the holdings in *Kawcak* and *Dyer*, which determined that tortfeasors, conspiring and colluding for their own private financial gain, are not entitled to protection under the right of association." *Id.* (citing *In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012); *Dyer*, 573 S.W.3d at 427; *Kawcak*, 582 S.W.3d at 588).

As a result, the court of appeals found,

Defining "common" to include a public component is in line with the TCPA's statutory scheme because it corresponds to the express purpose of the TCPA to protect constitutional rights, while at the same time protecting the rights of persons to file meritorious lawsuits for demonstrable injury. *See* TEX. CIV. PRAC. & REM. CODE § 27.002. Requiring a public component also harmonizes the definition with the other two exercises of rights—right of free speech and right to petition—defined in the TCPA, which both "have some public component." *Kawcak*, 582 S.W.3d at 579. The "exercise of the right to free speech" requires a "communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE § 27.001(3). And the "exercise of the right to petition" requires a communication that pertains to governmental or at a minimum, public, proceedings. *Id.* § 27.001(4). It would be "incongruous to conclude" that the word "common," as used in the definition of exercise of the right of association, does not require a public component. *Kawcak*, 582 S.W.3d at 579.

*Id.* at 474. Because the employees' communications about their business venture did not relate "to a community at large:  public," the court of appeals concluded that they failed to meet their

29

burden to show that WSP's lawsuit was related to an exercise of their right of association. *Id.* at 476.

The Legislative amendments also influenced the Amarillo, San Antonio, Dallas, and Austin Courts of Appeals. The Amarillo court essentially borrowed the amended language even though the former version of the TCPA applied and concluded that "the legislature intended for the right of association to require some degree of group participation involving an expression about a matter of public interest." *Tex. Custom Wine Works, LLC v. Talcott*, 598 S.W.3d 380, 386 (Tex. App.—Amarillo 2020, no pet.). The Amarillo court did not focus its attention on the meaning of the word "common" as did *Gaskamp*, but instead reasoned that adopting a position similar to the one advanced by Appellees would "give constitutional right of association protection to virtually any private communication between two people about a shared private interest" in a manner "not consistent with the purposes of the TCPA, which is to curb strategic lawsuits designed to chill public participation." *Id.*[14] The San Antonio court found that the amendments were highly persuasive of the interpretation of the former TCPA, that the Legislature had effectively adopted the *Kawcak*'s court's analysis of the right of association, and applied *Kawcak* in concluding that the right of association was not shown by communications that involved private business interests. *Segundo Navarro Drilling, Ltd. v. San Roman Ranch Mineral Partners, Ltd.*, No. 04-19-00484-CV, 2020 WL 4808716, at *5 (Tex. App.—San Antonio Aug. 19, 2020, no pet. h.).

---

[14]The Amarillo court distinguished *O'Hern* and *Roach* by noting that the communications there had a direct effect on the public. *Segundo Navarro Drilling, Ltd.*, 2020 WL 4808716, at *5.

Likewise, after citing the amendments, the Dallas Court of Appeals found that "[c]onstruing the TCPA to find a right of association . . . simply because there are communications between parties with a shared interest in a private business transaction does not further the TCPA's purpose to curb strategic lawsuits against public participation." *Perlman v. EKLS Firestopping & Constr., LLC*, No. 05-18-00971-CV, 2019 WL 2710752, at *3 (Tex. App.—Dallas June 28, 2019, no pet.) (mem. op.). Instead, the Dallas court concluded that the communications forming the alleged right of association had to "involve public or citizen participation." *Id.* at *3.

In *Crossroads Cattle Co., Ltd. v. AGEX Trading, LLC*, the Austin Court of Appeals found that conducting business in the cattle industry "as buyer and seller in a particular transaction, without evidence of a specific common interest beyond that transaction, d[id] not meet the statutory definition of exercising the right of association." *Crossroads Cattle Co. v. AGEX Trading, LLC*, 607 S.W.3d 98, 104 (Tex. App.—Austin 2020, no pet.). While its decision was not specifically based on the legislative amendments, it was based on the Texas Supreme Court's reasoning in *Creative Oil & Gas, LLC*, which looked to the legislative amendments in its statutory construction of the TCPA's free speech language. 607 S.W.3d at 105. The Austin Court of Appeals wrote:

> Guided by the supreme court's recent pronouncement in *Creative Oil and Gas* as to the parameters of the "exercise of the right of free speech"—that the communications at issue "have some relevance to a wider audience of potential buyers or sellers in the marketplace, as opposed to communications of relevance only to the parties to a particular transaction"—we conclude that the exercise of the right of association is similarly not so broad as to encompass nearly every interaction between individuals simply because they each desire the interaction.

31

*Id.* (citing *Creative Oil & Gas, LLC*, 591 S.W.3d at 134; *Gaskamp*, 596 S.W.3d at 475–76).

### 4. Looking to the Highly Persuasive Legislative Amendments, We Believe Tyler Would Conclude that Freedom of Association Was Not Implicated Under the TCPA

"When the meaning of an existing law is uncertain, the Legislature's later interpretation of it is highly persuasive." *Tex. Water Comm'n*, 917 S.W.2d at 21. The Legislature amended the TCPA simply to clarify the scope and applicability of the statute's former version. The Minority Shareholders' complaints stem from the 2015 Transfer of a close corporation's interest to the Majority Shareholders and an alleged bonus payment to Cason. For the variety of reasons discussed in the *Post-Amendment Cases* section, we find that, while Appellees communicated about the 2015 Transfer and alleged bonus payment, they were not collectively expressing, promoting, or defending common interests of a community or public at large, but rather private financial or private business interests. As a result, we conclude that the Minority Shareholders' lawsuit was not based on, related to, or in response to Appellees' exercise of their right of association.

We find that the TCPA did not apply to the Minority Shareholder's claims. As a result, we find that the trial court erred in dismissing their claims and in awarding attorney fees and sanctions to Appellees.[15]

---

[15]The recitation of facts and our characterization of the record is not meant to express any opinion on the merits of any claim or defense in this case, which will be decided on remand.

## IV.    Conclusion

We reverse the trial court's judgment and remand this case for further proceedings.


Ralph K. Burgess
Justice

Date Submitted:    September 30, 2020
Date Decided:      November 19, 2020